PRESENT: All the Justices.

JENNIFER WRIGHT

OPINION BY
v.  Record No. 030658            JUSTICE G. STEVEN AGEE
                                      March 5, 2004
RICHARD C. KAYE, M.D.


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Herman A. Whisenant, Jr., Judge


Prior to trial in this medical malpractice case, the trial court struck three standard of care expert witnesses designated by plaintiff Jennifer Wright ("Wright"), based on the fact that none had performed a urachal cyst excision, the exact medical procedure performed upon the plaintiff by the defendant, Dr. Richard C. Kaye ("Dr. Kaye").  With leave of court Wright designated a fourth expert witness who had performed that procedure, but the trial court also struck that expert.  The trial court then granted a motion for summary judgment by Dr. Kaye, denied Wright's motion for reconsideration, and dismissed Wright's case with prejudice.

On appeal to this Court, Wright assigns error to the trial court's rulings striking all of her expert witnesses, the use of depositions as a basis for the court's decisions, the grant of summary judgment, and the denial of her motion for reconsideration.  She also assigns error to the trial court's denial of certain motions in limine.

## I.   BACKGROUND

On August 20, 1997, Dr. Kaye performed diagnostic laparoscopic surgery on Wright to discover the source of her chronic pelvic pain.  During the procedure he found a cyst on her urachus.[1]  Using an internal surgery and suturing device known as an endo-GIA surgical stapler, Dr. Kaye excised the cyst and stapled the affected area closed, noting in his operative report that "[i]t appeared that this was done away from the bladder."

Following removal of the cyst, Wright's bladder was filled with methylene blue and Dr. Kaye noted none was observed in the pelvis.  Dr. Kaye did not perform a cystoscopy to visualize the dome of the bladder to determine whether staples were inserted into it during the cyst excision procedure.

Following the surgery, Wright began to experience urinary frequency and urgency with bladder spasms.  Eventually she consulted physicians other than Dr. Kaye when her symptoms continued unabated.  Approximately one year after the surgery, another surgeon discovered and removed six surgical staples from Wright's bladder, apparently left from the urachal cyst

---

[1] The "urachus" is "[a]n epithelioid cord surrounded by fibrous tissue extending from the apex of the bladder to the umbilicus.  In the embryo, it is continuous with the allantoic stalk; postnatally it forms the middle umbilical ligament of the bladder."  Taber's Cyclopedic Medical Dictionary 2180 (19th ed. 2002).

2

laparoscopy.  Wright continues to suffer permanent bladder dysfunction.

Prior to trial Wright designated three expert witnesses[2] ("Wright's experts") to testify regarding the applicable standard of care.  Wright's experts specialized in the same field of medicine as Dr. Kaye, obstetrics and gynecology, and two of them had subspecialties in urogynecology.  Although Wright's experts had all performed multiple laparoscopic surgeries, including the removal of cysts in the female pelvic area near the bladder in procedures employing a surgical stapler, each testified in depositions they had never removed a cyst located on the urachus.  Dr. Kaye moved the trial court to strike Wright's experts on the basis that "none of these experts have 'recently engaged in the actual performance of the procedures at issue in [the] case.' "  Approximately four weeks prior to trial, the trial court granted Dr. Kaye's motion and struck Wright's experts, finding they lacked "knowledge of this particular specialty."

After Wright's experts were stricken, Dr. Kaye moved for summary judgment claiming Wright did not have the required experts to support her allegations of breach of the standard of

_____

[2] For purposes of this opinion Dr. Bruce A. Rosenzweig, Dr. Mickey M. Karram and Dr. Michael A. Ross are included in the term "Wright's experts."  Dr. Charles M. Jones is excluded from that term and referred to by name.

3

care.  Wright moved for a continuance and leave to designate a new expert witness.  The trial court deferred ruling on Dr. Kaye's motion until the trial date and granted Wright's motion to file a supplemental designation of experts.  The trial court did not rule on Wright's motion for a continuance, but took it under advisement pending the trial date to await the designation of an expert.  Wright timely designated a new expert witness, Dr. Charles M. Jones ("Dr. Jones").

Dr. Kaye had previously designated a standard of care expert, Dr. Hans-Barthold Krebs ("Dr. Krebs"), a shareholder in the same professional corporation as Wright's current treating physician, Dr. Jeffrey A. Welgoss ("Dr. Welgoss"), who was to testify for Wright.  Wright filed a motion in limine to exclude and disqualify Dr. Krebs as an expert witness asserting it would be a conflict of interest for him to testify because of the professional relationship between Drs. Krebs and Welgoss.  Further, Wright contended that Dr. Krebs' testimony would violate the patient-physician relationship protected by Code § 8.01-399.  Wright's motion was denied.

Wright also filed a motion in limine seeking to exclude any testimony regarding pre-operative discussions between Wright and Dr. Kaye concerning the risks of surgery.  Wright argued that since she did not claim that Dr. Kaye failed to obtain her informed consent, any testimony concerning discussion of the

risks of surgery was not relevant to either negligence or causation and would only confuse the jury. The trial court denied Wright's motion.

Wright filed additional motions in limine to exclude testimony by Dr. Kaye of an intraoperative consultation he undertook by telephone with Dr. Guillermo Gil-Montero ("Dr. Gil-Montero") during Wright's surgery and to prohibit testimony about a prior urachal cyst surgery performed by Dr. Kaye on an unrelated patient. The trial court denied both motions.

On October 28, 2002, the date set for trial, the trial court found that Wright's designation of Dr. Jones raised new issues prejudicial to Dr. Kaye such that Dr. Jones would not be permitted to qualify as an expert witness and testify.

The trial court then denied Wright's motion for a continuance and granted Dr. Kaye's motion for summary judgment.[3] Subsequently, the trial court denied Wright's motion for reconsideration of its prior decisions and dismissed Wright's case with prejudice. We granted Wright this appeal.

## II. STANDARD OF REVIEW

"A trial court's exercise of its discretion in determining whether to admit or exclude evidence will not be overturned on

---

[3] Wright objected to the use of deposition testimony as a basis for striking Wright's experts and, in turn, granting summary judgment. As later noted, we do not reach that issue in the resolution of this appeal.

appeal absent evidence that the trial court abused that discretion." May v. Caruso, 264 Va. 358, 362, 568 S.E.2d 690, 692 (2002) (citing John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002)). Likewise, "whether a witness is qualified to testify as an expert is 'largely within the sound discretion of the trial court.' " Perdieu v. Blackstone Family Practice Center, Inc., 264 Va. 408, 418, 568 S.E.2d 703, 709 (2002) (quoting Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979)); see also Swersky v. Higgins, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953). However, in an action alleging medical malpractice, we will overturn a trial court's exclusion of a proffered expert opinion "when it appears clearly that the witness was qualified." Perdieu, 264 Va. at 418, 568 S.E.2d at 709 (quoting Noll, 219 Va. at 800, 250 S.E.2d at 744).

III.  WRIGHT'S EXPERTS AND SUMMARY JUDGMENT

A physician licensed in Virginia is presumed to know the standard of care in that physician's specialty or field of medicine. Code § 8.01-581.20(A). The presumption also attaches to out-of-state physicians who meet the educational and examination requirements of the statute.[4] See, e.g., Black v. Bladergroen, 258 Va. 438, 443, 521 S.E.2d 168, 170 (1999). It

---

[4] It was uncontested that Dr. Ross is a Virginia licensed physician and Drs. Rosenzwieg and Karram met the educational and

is uncontradicted that Wright's experts were specialists in the medical field of obstetrics and gynecology, with extensive experience in laparoscopic surgery in the female pelvic region near the bladder including the removal of cysts. All had experience with the endo-GIA surgical stapler and in performing cystoscopies to inspect the dome of the bladder. Accordingly, the statutory presumption that Wright's experts knew the standard of care for Dr. Kaye's specialty field of medicine applied to each of them.

The issue in this case, although not specifically articulated by the trial court, is whether that presumption was rebutted so as to disqualify Wright's experts from testifying as expert witnesses in this case. Under Code § 8.01-581.20(A), a witness to whom the presumption applies may nonetheless be disqualified as an expert witness if he does not meet either of two statutory requisites: (1) to "demonstrate[] expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards" ("knowledge requirement") or (2) to show that he had an "active clinical practice in either the defendant's specialty or related field of medicine within one year of the date of the alleged act or omission forming the basis of the action" ("active clinical

examination requirements for licensure in Virginia. All were board certified in Obstetrics and Gynecology.

7

practice requirement"). Conversely, "[a] witness shall be qualified to testify as an expert" if both statutory requisites are met. Code § 8.01-581.20(A) (emphasis added).

Citing our opinion in Sami v. Varn, 260 Va. 280, 535 S.E.2d 172 (2000), Dr. Kaye moved to strike Wright's experts alleging that "none of these experts have 'recently engaged in the actual performance of the procedures at issue in [the] case.' " Dr. Kaye thus contended that Wright's experts failed to meet the active clinical practice requirement.

The trial court granted Dr. Kaye's motion and struck Wright's experts because they did "not have sufficient expert knowledge regarding the medical procedure at issue in this case (i.e., urachal cystectomy) to qualify them as expert witnesses pursuant to . . . Code § 8.01-581.20." The trial court did not rule directly on Dr. Kaye's claim that Wright's experts failed to meet the active clinical practice requirement, but based its decision on failure to satisfy the knowledge requirement. As support for its ruling, the trial court referenced our decision in Lawson v. Elkins, 252 Va. 352, 477 S.E.2d 510 (1996), and noted the uncontested facts that

> [n]one of these three witnesses have ever
> performed an urachal cystectomy in the past; none
> have ever seen it performed; none have ever been
> taught how to perform it; none have ever
> published, lectured, or attended continuing
> medical education courses in reference to urachal
> cystectomies.

8

Wright asserts on appeal that the trial court erred in striking her experts because Dr. Kaye did not rebut the statutory presumption.  She avers her experts met both statutory requisites when viewed in the context of the medical procedure at issue.  Wright's position is that excision of an urachal cyst is not the relevant medical procedure for evaluating either statutory requisite because that is not the alleged act upon which the claim of malpractice is based.  Instead, she contends the medical procedure at issue is the performance of laparoscopic surgery in the female pelvic region near the bladder using a surgical stapler and it is upon that basis the qualification of her experts must be judged.

Dr. Kaye urges affirmance of the trial court, contending the failure to actually perform, witness or be schooled in removal of a cyst from the urachas proves Wright's experts fail the knowledge requirement and the statutory presumption is thereby rebutted.  Dr. Kaye also contends, as an alternate ground of affirmance, that the failure to actually perform urachal cyst excision within the statutory time window confirms that Wright's experts fail to meet the active clinical practice requirement as now defined under our decisions in Sami and Perdieu.  Dr. Kaye's position is that urachal cyst excision is the only relevant medical procedure by which either the

9

knowledge or active clinical practice requisites are to be measured in this case. He argues removing an urachal cyst is such a unique procedure that it mandates a specific esoteric knowledge and practice requirement as a condition precedent for any expert witness.

For the reasons stated below, we disagree with Dr. Kaye and hold the trial court's grant of the motion striking Wright's experts was in error.

> The question whether a witness is qualified to testify as an expert is "largely within the sound discretion of the trial court." Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979) (citing Swersky v. Higgins, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953)). In the context of a medical malpractice action, this determination must be made with reference to Code § 8.01-581.20. "A decision to exclude a proferred expert opinion will be reversed on appeal only when it appears clearly that the witness was qualified." Noll, 219 Va. at 800, 250 S.E.2d at 744, (citing Landis v. Commonwealth, 218 Va. 797, 800, 241 S.E.2d 749, 751 (1978)).

Perdieu, 264 Va. at 418, 568 S.E.2d at 709.

> However, we will reverse a holding that a witness is not qualified to testify as an expert when it appears clearly from the record that the witness possesses sufficient knowledge, skill, or experience to make him competent to testify as an expert on the subject matter at issue. Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979).

Sami, 260 Va. at 284, 535 S.E.2d at 174.

Wright does not allege in her motion for judgment any injury to the urachus or that removal of the urachal cyst by

laparoscopic surgery using a stapler, in and of itself, was a deviation from the applicable standard of care. Indeed, Wright represented to the trial court that "the decision of the Defendant Kaye to remove the urachal cyst during the diagnostic laparoscopic surgery for pelvic pain, proceeding with a laparoscopic approach to remove the cyst and to use the Endo stapler as a method of excising the cyst have not been criticized."

What Wright does allege is that Dr. Kaye deviated from the applicable standard of care when he failed to follow proper medical procedures by injuring an organ (the bladder) away from his operative field (the urachus). Specifically, she pled Dr. Kaye got too close to the bladder when firing staples because he failed to properly visualize the plane of the bladder during the surgery, causing the staples to enter the dome of the bladder. Further, she pled that Dr. Kaye violated the standard of care required when operating in the vicinity of the bladder by failing to inspect the dome of the bladder cystoscopically prior to concluding surgery. Accordingly, Wright argues the medical procedure at issue to evaluate the statutory requisites is laparoscopic surgery in the female pelvic region near the bladder.

The record does not reflect evidence establishing a unique standard of care for urachal cyst surgery as it relates to the

11

injury of the bladder or other organs outside that operative field which differs from the standard of care for other surgery adjoining the bladder. The medical literature Dr. Kaye references supports Wright's position that urachal cyst excision is the application of general surgery techniques for related procedures:

> "Laparoscopic technique for urachal sinus/cyst excision is an extension of the surgical principles used in the reported cases. The skill and expertise necessary for performing this particular operation were acquired in performing the other procedures."

Nelson M. Stone, et al., Laparoscopic Excision of a Urachal Cyst, 45 Urology 161, 163 (1995).

Dr. Kaye's own proffered deposition testimony established he "intended to stay clear of the bladder" which was "at least two centimeters, three centimeters" from the urachal cyst. He also testified that in performing Wright's surgery he intended "to not incorporate the bladder into the procedure because it wouldn't have furthered the procedure and benefitted the patient in any manner." Further, Dr. Kaye also stated that he knew placing a staple into the bladder could cause injury to it and "would not have served any constructive purpose in her surgery to staple the dome of the bladder."

We determined in Lawson that the rejected expert failed to meet the knowledge requirement of the statutory test because he

12

did not have sufficient knowledge of the applicable standards of care for the medical procedure at issue. 252 Va. at 354-55, 477 S.E.2d at 511. While the location of the intended medical treatment in Lawson was a disc (whereas here it was the urachus), chemonucleolysis was the medical procedure at issue for purposes of determining the knowledge requirement. Id. Similarly, the issue in the instant case is the standard of care for laparoscopic surgery in the vicinity of the bladder involving use of a surgical stapler.

If Wright's theory of the case were pled to claim injury to the urachus or that removing the urachal cyst with a stapler, in and of itself, was below the standard of care, Dr. Kaye's argument might prevail. But the acts Wright claims form the basis of her action and violate the standard of care are medical procedures applicable during laparoscopic surgery in the female pelvic region in the vicinity of the bladder. Whether Wright's experts had knowledge of the standard of care for those procedures determines whether they met the statutory requisites.

When seen in terms of the medical procedure at issue in the case at bar, it is clear that Wright's experts were qualified as to the knowledge requirement of the statutory requisites. Perdieu, 264 Va. at 418, 568 S.E.2d at 709. It is uncontested that Wright's experts, by education, training and practice have extensive and contemporary knowledge of the standard of care in

13

Dr. Kaye's field of medicine involving female pelvic laparoscopic surgery, including the removal of cysts and similar pathologies around the bladder by surgical stapler. The record reflects Wright's experts possess "sufficient skill, knowledge, or experience to make [them] competent to testify as an expert on the subject matter at issue." Sami 260 Va. at 284, 535 S.E.2d at 174. Dr. Kaye thus failed to rebut the statutory presumption and the trial court therefore erred in granting the motion to strike Wright's experts.

While we conclude the trial court erred in its application of the knowledge requirement of the statutory requisites, that does not end our inquiry. Dr. Kaye's motion to strike Wright's experts also alleged failure to meet the active clinical practice requirement. He argues on appeal this is an alternative basis upon which the trial court's judgment should be affirmed, as failure to meet either statutory requisite would disqualify a proffered expert witness.

The General Assembly has required in § 8.01-581.20(A) that an expert witness in a medical malpractice action have "had active clinical practice in . . . the defendant's specialty . . . within one year of the date of the alleged act or omission forming the basis of the action." As with the knowledge requirement, determining whether a proffered witness meets the active clinical practice requirement is also determined by

14

reference to the relevant medical procedure.  In this case, we have already determined that procedure to be laparoscopic surgery in the female pelvic area near the bladder involving a surgical stapler.  The uncontested evidence is that Wright's experts had such a practice within the required statutory window of time.  Accordingly, Wright's experts would appear to satisfy the active clinical practice requirement.

However, Dr. Kaye contends that our decisions in Sami and Perdieu restrictively define "defendant's specialty" in the context of the active clinical practice requirement.  Dr. Kaye avers that we used the phrase "actual performance of the procedures at issue" to create an active clinical practice requirement that an expert witness must have performed the same medical procedure with the same pathology in all respects as gave rise to the alleged act of malpractice at issue in order to have practiced in the defendant's specialty.  In this case, although the alleged act of malpractice is stapling of the bladder due to defective visualization and failure to perform a cystoscopy, Dr. Kaye argues that experience with female pelvic laparoscopic operations near the bladder is insufficient because the alleged negligent act was preceded by, or in the course of, an urachal cyst excision.  Dr. Kaye misreads our decisions.

In Sami we said:

> The purpose of the requirement in § 8.01-581.20
> that an expert have an active practice in the
> defendant's specialty or a related field of
> medicine is to prevent testimony by an individual
> who has not recently engaged in the actual
> performance of the procedures at issue in a case.
> Therefore, we conclude that, in applying the
> "related field of medicine" test for the purposes
> of § 8.01-581.20, it is sufficient if in the
> expert witness' clinical practice the expert
> performs the procedure at issue and the standard
> of care for performing the procedures is the
> same.

260 Va. at 285, 535 S.E.2d at 175.

The issue in Sami was whether an obstetrician-gynecologist testifying as to the standard of care for pelvic exams performed by an emergency room physician fell within the "related field of medicine" test when evaluating the active clinical practice requirement. The related field of medicine test is not at issue in this case. Further, in evaluating either statutory requisite, the term "actual performance of the procedures at issue" must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care. In this case, as noted above, that is not excision of the urachal cyst, but injury to the bladder.

Taking examples from our recent cases, Dr. Kaye would read Sami to require of an expert witness testifying under the facts in Lawson as to treatment of a herniated disc at L4, to have actually treated a disc at L4 and not L5 or L3. Otherwise, the proffered expert would not have an active clinical practice in

16

the defendant's specialty.  Similarly, Dr. Kaye's reading as applied to the facts in Perdieu would require an expert witness to have performed the actual fracture procedure as existed in that case.  If the injured party had fractured the left hip, Dr. Kaye would argue that Sami requires only performance of the actual procedure of treating a fractured left hip within the one-year practice window, and not a fractured right hip, meets the active clinical practice requirement.  The General Assembly did not intend to write such a narrow test.[5]

The phrase "actual performance of the procedures at issue in a case" is not to be given a narrow construction inconsistent with the plain terms of the statute.  As with the statute's knowledge requirement, the relevant medical procedure for purposes of satisfying the active clinical practice prerequisite

---

[5] While expert testimony might establish a significant medical distinction for a differing standard of care between a medical procedure at L3 as opposed to L4 or the right hip fracture as opposed to the left hip fracture, that distinction is not to be assumed.  Once the statutory presumption applies, the burden rests on the party opposing the proposed expert to produce some evidence establishing any distinction affecting the standard of care regarding the medical procedures at issue. There is none in this case.

is actual performance of female pelvic laparoscopic procedures around the bladder for the reasons heretofore explained.[6]

Accordingly, because the record reflects Wright's experts demonstrated knowledge of the standard of care in Dr. Kaye's specialty and that they had an active clinical practice in that specialty, they were qualified as expert witnesses in this case. The trial court was therefore in error to strike Wright's experts and enter summary judgment for Dr. Kaye based on Wright's lack of expert witnesses to support her allegations of the breach of the standard of care.[7]

## IV. DR. KREBS

The next issue for consideration is whether the trial court abused its discretion by failing to exclude Dr. Krebs as an expert witness for the defendant. It did not.

Dr. Krebs is a member of Northern Virginia Pelvic Surgery Associates, P.C. ("NVPSA") as is Dr. Welgoss. Subsequent to the

---

[6] Our use of the phrase "actual performance of the procedures at issue" in Perdieu is consistent with this explanation. The proposed and correctly rejected experts in that case were not found to lack an active clinical practice because they had treated a left versus a right hip fracture. They were rejected as experts because they had not treated any fractures of any kind during the statutory window of time for satisfying the active clinical requirement.

[7] As the trial court's decision to strike Wright's experts is reversed, we do not reach Wright's assignment of error that the trial court erred in basing its decision in part on the discovery depositions of Wright's experts. Similarly, we do not reach Wright's assignment of error to the trial court's ruling striking Dr. Jones as an expert witness.

18

surgery by Dr. Kaye and the later removal by another surgeon of the staples in her bladder, Wright had an initial office consultation with Dr. Welgoss. Wright was moving to Colorado and Dr. Welgoss referred her to a physician in that state. Upon returning to Virginia, Wright resumed her doctor-patient relationship with Dr. Welgoss, who also agreed to testify on Wright's behalf as an expert witness. Prior to Wright's return to Virginia, but after the initial consultation with Dr. Welgoss, Dr. Krebs agreed to assist Dr. Kaye as an expert witness in the present litigation.

Wright asserts that unless she consents, Dr. Krebs is barred from serving as an expert witness. She argues that a doctor affiliated with a treating physician is automatically barred from testifying for a party adverse to the patient. In addition, Wright argues that Code § 8.01-399 bars physicians and affiliated physicians from offering testimony regarding a patient's care without the patient's consent. The trial court rejected both of Wright's arguments. We agree with the trial court's judgment.

## A.   Affiliated Experts

The question of affiliated experts presented by Drs. Krebs and Welgoss is one of first impression in Virginia. The issue is whether, in the medical malpractice context, a physician employed in the same medical practice as the plaintiff's medical

19

expert may testify on behalf of the defendant without the plaintiff's consent.

In <u>Turner v. Thiel</u>, 262 Va. 597, 553 S.E.2d 765 (2001), we addressed a somewhat related issue concerning an expert employed by one party who later switched sides and assisted an opposing party, commonly termed "side-switching" experts. In <u>Turner</u>, we adopted the test employed by the majority of courts to consider that issue. The side-switching expert test is whether it was "objectively reasonable for the first party who claims to have retained the expert witness to conclude that a confidential relationship existed between that party and the expert" and, if so, "did the first party disclose any confidential or privileged information to the expert witness." <u>Id.</u> at 601, 553 S.E.2d at 768 (citations omitted). The party seeking disqualification bears the burden as to both elements. <u>Id.</u>

The majority of courts analyzing the affiliated expert issue utilize a test similar to the side-switching expert test adopted in <u>Turner</u>. Under the majority rule, a court must determine whether the moving party has produced "evidence that any substantive information about the case has been exchanged between the affiliated experts." <u>City of Springfield v. Rexnord Corp.</u>, 111 F. Supp. 2d 71, 75 (D. Mass. 2000); <u>In re Malden Mills Indus., Inc.</u>, 275 B.R. 670, 673 (Bankr. D. Mass. 2002) ("If an expert witness is affiliated with an expert for the

other side, the test for disqualification still revolves around the transfer of confidential information."). As in side-switching cases, the party seeking disqualification bears the burden of proof. Rexnord Corp., 111 F. Supp. 2d at 73.

We find the majority rule comparable to our test for side-switching experts in Turner and hereby adopt the majority rule governing affiliated experts. Therefore, we must decide whether Wright, the party seeking disqualification, has offered sufficient evidence that Drs. Krebs and Welgoss exchanged confidential information regarding her treatment. The trial court correctly found that Wright failed to carry this burden.

Wright notes that NVPSA's files are centrally located and that the members of the firm occasionally discuss a particular patient's care. However, Wright has offered no evidence that Dr. Krebs and Dr. Welgoss shared confidential information (or any information of any kind) regarding her care. Wright asserted in her motion to exclude Dr. Krebs that she was not required to prove an actual exchange of information because a court should impute an exchange in the context of affiliated experts. She is mistaken. Absent evidence of an actual exchange of confidential information, an affiliated expert should not be excluded and no disqualifying conflict exists.

21

Alternatively, Wright argues that Code § 8.01-399 bars a physician affiliated with a treating physician from testifying adversely to a patient.  That statute provides:

> Except at the request or with the consent of the patient, or as provided in this section, no duly licensed practitioner of any branch of the healing arts shall be required to testify in any civil action, respecting any information that he may have acquired in attending, examining or treating the patient in a professional capacity.

Code § 8.01-399(A).

The plain language of Code § 8.01-399(A) leads to the conclusion that Dr. Krebs is not barred by the statute from serving as an expert for Dr. Kaye.  First, Code § 8.01-399 states that no practitioner of the healing arts "shall be required" to offer testimony.  Dr. Krebs agreed to testify voluntarily – his testimony was in no way "required".  Second, the type of testimony barred is that acquired by a practitioner "in attending, examining or treating the patient in a professional capacity."  It is uncontested that Dr. Krebs did not attend, examine, or treat Wright and thus could not offer any testimony with respect to information he never so received.

Finally, the statute applies only to the "practitioner," a term not defined to include the practitioner's partners or practice entity.  That the General Assembly did not intend for "practitioner" to be an all-inclusive term is evidenced by Code

22

§ 8.01-399(D)(1) describing communications between

"practitioners" and "that practitioner's employers, partners,

agents, servants, employees, [or] co-employees."  Clearly, the

General Assembly demonstrated in this very statute that it knows

how to differentiate between the "practitioner" and his

"partners" and did so.  This negates any inference that

"practitioner" is an expansive term encompassing the

practitioner's affiliated physicians.

For the reasons set forth above, the trial court correctly

denied Wright's motion to exclude Dr. Krebs.

## V. TESTIMONY REGARDING PRIOR SURGERY

Wright argues the trial court erred in denying her motion

in limine to exclude testimony concerning Dr. Kaye's performance

of a previous surgery with Dr. Krebs for the removal of an

urachal cyst on an unrelated patient.  The trial court

determined that testimony was admissible because "it would go to

the experience and training that was received by Dr. Kaye as

well as who provided the experience and training . . . in this

particular matter."

Wright contends that testimony from Drs. Kaye or Krebs that

Dr. Kaye had previously performed the urachal cyst procedure

would amount to evidence that their "customary method" was

tantamount to the requisite standard of care.  However, Wright

confuses the issue of the standard of care, for which evidence

23

about the customary method of treatment would not be admissible, see King v. Sowers, 252 Va. 71, 471 S.E.2d 481 (1996), with the common and relevant topic of a party physician's training and education.

We have consistently recognized that a physician's training and experience are relevant and probative of whether expert testimony is admissible in a medical malpractice action. Grubb v. Hocker, 229 Va. 172, 176, 326 S.E.2d 698, 700-01 (1985) ("[T]he knowledge necessary to qualify a witness to testify as an expert might be derived from study alone, or experience, or both.") (citing Noll, 219 Va. at 801, 250 S.E.2d at 745); see, e.g., Perdieu, 264 Va. at 420, 568 S.E.2d at 710 (witnesses not qualified because they had not "recently engaged in the actual performance of the procedures at issue"); Sami, 260 Va. at 284, 535 S.E.2d at 174 (overruling trial court's disqualification of expert witness who had requisite knowledge of standard of care for pelvic examinations).

It would create an anomalous and inequitable circumstance should the proffered experts in a medical malpractice action be required to show their training and experience in order to qualify as an expert to testify as to the defendant's conformance to the standard of care, but yet prohibit that same defendant from presenting the identical information about himself. Evidence that Dr. Kaye had previously performed an

urachal cyst procedure is relevant and probative as to his training and experience to undertake and perform a laparoscopic female pelvic operation near the bladder in accordance with the applicable standard of care. We thus find no error in this ruling of the trial court.

## VI. RISK OF SURGERY DISCUSSIONS

Wright filed a motion in limine to exclude evidence of discussions between herself and Dr. Kaye as to the risk of injury to the bladder during an urachal cystoscopy. The trial court denied Wright's motion, ruling from the bench:

> I think indeed the jury knows that a prudent doctor must advise patients concerning any risk prior to surgery. If you don't show that, immediately you've implied that maybe this doctor is negligent to begin with. So I would find that it certainly would be fair to show that he did what a prudent doctor would do and advise of that particular risk.

Under the facts of this case, we hold the trial court's ruling to be erroneous. In resolving this issue, it is a particularly salient fact that Wright does not plead or otherwise place in issue any failure on the part of the defendant to obtain her informed consent. Her claim is simply that Dr. Kaye was negligent by deviating from the standard of care in performing the medical procedure at issue.

Seen in that context, evidence of information conveyed to Wright concerning the risks of surgery in obtaining her consent

25

is neither relevant nor material to the issue of the standard of care.  Further, the pre-operative discussion of risk is not probative upon the issue of causation: whether Dr. Kaye negligently performed the procedure.

Wright's awareness of the general risks of surgery is not a defense available to Dr. Kaye against the claim of a deviation from the standard of care.  While Wright or any other patient may consent to risks, she does not consent to negligence. Knowledge by the trier of fact of informed consent to risk, where lack of conformed consent is not an issue, does not help the plaintiff prove negligence.  Nor does it help the defendant show he was not negligent.  In such a case, the admission of evidence concerning a plaintiff's consent could only serve to confuse the jury because the jury could conclude, contrary to the law and the evidence, that consent to the surgery was tantamount to consent to the injury which resulted from that surgery.  In effect, the jury could conclude that consent amounted to a waiver, which is plainly wrong.  See Waller v. Aggarwal, 688 N.E.2d 274, 275-76 (Ohio Ct. App. 1996).

Accordingly, we hold the failure to grant Wright's motion in limine on this issue was error by the trial court.

## VII.  STATEMENTS OF DR. GIL-MONTERO

Wright also sought to bar Dr. Kaye from testifying at trial regarding an intraoperative consultation he had with an

urologist, Dr. Gil-Montero. According to the proffered testimony, Dr. Kaye would testify that Dr. Gil-Montero consulted with him during Wright's surgery and informed him he was far enough from the bladder to safely use the Endo-stapler and that no cystoscopy was needed prior to closing the surgery. However, Dr. Gil-Montero could not testify, much less be cross-examined, as to the truth or falsity of what Dr. Kaye would testify he said, because it is uncontested Dr. Gil-Montero has no recollection of the events.

The trial court denied Wright's motion, ruling from the bench that Dr. Kaye's proposed testimony of Dr. Gil-Montero's statements was not offered "for the truth of what indeed the doctor said, that is Dr. Gil-Montero, but simply to show why Dr. Kaye did what he did in this particular matter . . . . I think it would be the exception to the hearsay rule, that it does state why Dr. Kaye is doing what he did . . . ."

Wright argues the trial court erred because Dr. Kaye's testimony would be inadmissible hearsay offered to prove the truth of the statements made and justify his conformance to the standard of care by confirming he was away from the bladder and was justified in not performing a cystoscopy. We agree with Wright.

In <u>Williams v. Morris</u>, 200 Va. 413, 105 S.E.2d 829 (1958), we stated:

27

> Heresay evidence has been defined as evidence which derives its value, not solely from the credit to be given the witness on the stand, but in part from the veracity and competency of some other person.  It is primarily testimony which consists in a narration by one person of matters told him by another.  A clear example of hearsay evidence is where a witness testifies to the declaration of another for the purpose of proving the facts asserted by the declarant.

Id. at 416-17, 105 S.E.2d at 832 (citations omitted).

As a narration of a conversation between them, Dr. Kaye's testimony of statements purportedly made to him by Dr. Gil-Montero is classic hearsay.  See Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977).  The issue is whether any of the numerous exceptions to the hearsay rule would nonetheless permit Dr. Gil-Montero's statements into evidence through Dr. Kaye.  We find no such exception.

While Dr. Gil-Montero's statements would be some evidence of Dr. Kaye's state of mind (why he proceeded in Wright's procedure as he did), that would be true, to some degree, of almost any hearsay statement offered by its proponent.  In its obvious and central thrust, Dr. Gil-Montero's statements would go directly to the ultimate issue of the standard of care: that Dr. Kaye was not too close to the bladder when he fired the staples and the standard of care did not require inspection of the bladder by cystoscopy before closing Wright's surgery. Allowing Dr. Kaye to relay Dr. Gil-Montero's statements would be

28

tantamount to admitting unqualified expert testimony.[8]
Additionally, it is clear Dr. Kaye's statements were offered to prove the truth of the facts stated therein and are inadmissible hearsay.

The trial court erred in denying Wright's motion in limine as to Dr. Gil-Montero's statements.

## VIII.   CONCLUSION

For the reasons heretofore given, we hold the trial court erred in striking Wright's experts and granting summary judgment to Dr. Kaye.  We also hold the trial court erred in failing to

---

[8] In CSX Transportation v. Casale, 247 Va. 180, 441 S.E.2d 212 (1994), we stated:

> A medical expert's recital of the confirming opinion of an absent physician is inadmissible hearsay. McMunn v. Tatum, 237 Va. 558, 566, 379 S.E.2d 908, 912 (1989). Although Code § 8.01-401.1 authorizes admission into evidence of an expert's opinion that may be based in whole or in part upon inadmissible hearsay, "the statute does not authorize the admission of any hearsay opinion on which the expert's opinion was based." Todd v. Williams, 242 Va. 178, 181, 409 S.E.2d 450, 452 (1991). This is because "admission of hearsay expert opinion without the testing safeguard of cross-examination is fraught with overwhelming unfairness to the opposing party. No litigant in our judicial system is required to contend with the opinions of absent 'experts' whose qualifications have not been established to the satisfaction of the court, whose demeanor cannot be observed by the trier of fact, and whose pronouncements are immune from cross-examination." McMunn, 237 Va. at 566, 379 S.E.2d at 912.

Id. at 182-83, 441 S.E.2d at 214.

29

grant Wright's motions <u>in</u> <u>limine</u> to exclude the discussions about risk of surgery and to bar Dr. Kaye's testimony about Dr. Gil-Montero's statements.

We will affirm the trial court's judgment which denied Wright's motion <u>in</u> <u>limine</u> to bar Dr. Krebs' testimony because of his relationship with Dr. Welgoss. We will also affirm the trial court's judgment denying Wright's motion <u>in</u> <u>limine</u> to exclude evidence as to Dr. Kaye's prior performance of an urachal cyst excision.

Accordingly, the judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>